UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| APRIL E. BUCHANAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 3:19-CV-572-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| UNITED STATES OF AMERICA, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant's Motion for Summary Judgment. [R. 37].

Plaintiffs responded, [R. 40], and Defendant replied, [R. 41]. This matter is now ripe for

consideration. For the reasons below, the Motion will be granted in part and denied in part.

## I. BACKGROUND

This action arises from Nelson Turner's tragic fall while a patient at Robley Rex

Veterans' Affairs Medical Center ("VAMC") in Louisville, Kentucky, and his subsequent death.

[R. 1, pp. 2–3, ¶¶ 4–5]. April Buchanan, Turner's stepdaughter and the Executrix of his estate,

and Patricia Steiner, Turner's widow, timely filed their Complaint on August 12, 2019. *Id.* at 1–

6; *see also* 28 U.S.C. § 2401(b). Plaintiffs claim that VAMC staff and administration negligently

failed to properly attend to Turner before and after his fatal fall. *Id*. at 4–5, ¶ 12.

Before filing their claims in this Court, Plaintiffs exhausted their administrative remedies

within the Department of Veterans Affairs. *See Lundstrum v. Lyng*, 954 F.2d 1142, 1145 (6th

Cir. 1991) ("A prerequisite to suit under the FTCA . . . is the exhaustion by the plaintiff of

administrative remedies.") (citing 28 U.S.C. § 2675(a)). Plaintiffs filed a Notice of Claim and

Standard Form 95, which Defendant received on January 14, 2019. [R. 1, p. 2, ¶ 4; R. 10–1].

Defendant failed to act on that claim within six months. [R. 1, p. 2, ¶ 4]. Thus, Plaintiffs properly exhausted administrative remedies before filing suit.

Turner suffered from Parkinson's disease with associated dementia. [R. 1, p. 3, ¶ 5; R. 40–1, p. 1]. Turner's family brought him to the VAMC on July 31, 2018, due to worsening Parkinson's symptoms. [R. 40–1, p. 1]. After his initial diagnostic exam, nurses determined that Turner was at high risk for falls and outlined a care plan to address this risk. [R. 40–2, p. 7]. Turner walked with the assistance of a cane for balance. [R. 40–1, p. 1]. Based on his fall-risk designation and concerns with his mental state, his care instructions included the use of a wandering monitoring device ("wander guard"), a "request [for] assistance for daily activities," "assist with mobility," and hourly observations. *Id.* at 7–8; *see also* [R. 40–2, p. 8].

Witnesses provide different narratives of Turner's fall, and there is no video surveillance footage available of the actual fall. [R. 40, pp. 3–14; R. 40–1, p. 4]. On August 4, 2018, Turner left his room and began to wander around his unit (Five North). [R. 40–1, p. 2]. Nurse Dawn McNew was aware of Turner's movements and was attempting to contact Turner's wife when he quickly advanced down the hall. [R. 40–7, p. 3, 46:3–48:25]. Nurse McNew ran after Turner while yelling his name. [R. 40–8, pp. 9–10, 51:16–53:25; R. 40–7, p. 4, 49:13–50:14]. Although a wander guard should have alerted additional staff when Turner passed the nursing station, the alarm did not sound. [R. 40– 8, p. 7, 38:22–23]. However, Nurse Jeremy Wright testified that the wander guard alarm did sound at the far end of the unit. *Id.* Wright heard that alarm, along with McNew's yells for help, and began to assist McNew in redirecting Turner. *Id.* at 38, 53. Kathy Neace, a nurses' aide, also heard McNew's calls for help and observed the resulting events. [R. 40–7, p. 5, 53:23–54:8; R. 40–9, p. 2, 30:13–32:20]. Nurses Wright and McNew tried to escort Turner back to his room, while walking near him. [R. 40–8, p. 13, 68:4–25]. As they walked

back to Turner's assigned area, Turner raised his cane and  hit McNew with it. [R. 40–1, p. 3].

Turner then lost his balance and fell forward, striking his head on a door jam, and landing face

first onto the cement floor. *Id.* Immediately after Turner's fall, Neace told police that McNew

and Wright grabbed Turner's arms while trying to direct him back to his room. [R. 40–3, p. 7].

She further told police that McNew tried to take Turner's cane away from him, and he fell as a

result of McNew's attempt to take the cane. *Id.* McNew and Wright deny or do not recall holding

Turner or grabbing for his cane. [R. 40–7, pp. 10–11, 74:11–75:22; R. 40–8, p. 13, 68:4–7]. The

fall caused blunt force head trauma and resulted in Turner's death on August 12, 2018. [R. 40–

14].

Plaintiffs' Complaint makes ten (10) allegations that Defendant and its agents were

"negligent, grossly negligent, and/or acted with reckless disregard" by:

    a. Choosing not to adequately and competently assess Mr. Turner;
    b. Choosing not to provide a safe and secure environment;
    c. Choosing not to adequately and competently document Mr. Turner's condition;
    d. Placing Mr. Turner in imminent danger of serious harm and death by choosing not to provide him with a working monitoring device;
    e. Failing to treat him with appropriate medication after the fall;
    f. Choosing not to take steps to protect Mr. Turner;
    g. Choosing not to provide sufficient staffing of personnel to provide care and treatment;
    h. Choosing not to properly train and monitor the personnel who provided care for Mr. Turner and other similarly situated residents;
    i. Choosing not to provide appropriate assessment and intervention of falls;
    j. Choosing not to ensure that Mr. Turner had effective supervision to prevent a fall[.]

[R. 1, pp. 4–5, ¶ 12(a)-(j)]. Plaintiffs seek damages recoverable for "wrongful death, pain and

suffering, medical expenses, and loss of consortium." *Id.* at 5, ¶ 2.

Plaintiffs initially misunderstood the requirements for expert disclosures, but eventually

tendered a written report by Mary Alice Momeyer. [R. 30; R. 40–1, pp. 1–4]. Momeyer is a

clinical assistant professor of nursing at Ohio State University. [R. 40–15, p. 1]. In her four-page

report, Momeyer describes the facts of the case and denotes actions she believes deviated from

the standard of care. [R. 40–1, pp. 2–4]. She concluded that deviations in the standard of care by the VAMC and its staff caused Turner's fall and death. *Id.* at 4. In addition to Momeyer, Plaintiffs state that they plan to question (1) the VAMC staff that attended to Turner during the relevant events, and (2) Dr. Falls, the medical examiner who performed the autopsy on Turner, but they state that those witnesses will only provide factual testimony. [R. 40–12, pp. 1–3]. The Plaintiffs' deadline for expert disclosures was September 3, 2020, [R. 18, p. 2, ¶ 1(e)], and Plaintiffs have stated that they do not intend to introduce any additional experts, [R. 35].

Defendant filed a Motion for Summary Judgment on March 15, 2021. [R. 37]. Defendant argues Plaintiffs' claims sound purely in medical malpractice. [R. 37, p. 1]. Because Plaintiffs have failed to provide sufficient expert testimony on the standard of care, breach, and causation, Defendant contends the claims fail as a matter of law. *Id.* at 11–24. In support, Defendant also attached written reports from its own experts, Dr. Julian E. Bailes and Dr. Kiffany J. Peggs. [R. 37–3, pp. 1–3; R. 37–5, pp. 1–11]. Plaintiffs responded on April 12, 2021, [R. 40], contending that their expert supplied adequate testimony to support their medical malpractice claims and recasting some of the claims as involving "understaffing, corporate neglect, elder abuse and neglect" and "perhaps corporate deceit." [R. 40, pp. 1–2, 17–22]. Defendant replied. [R. 41].

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is "material" only if it could affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute exists if the evidence would allow a reasonable jury to return a verdict for the non-

movant. *Id.* A court must view the evidence and draw all reasonable inferences in the light most favorable to the non-movant. *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). The function of the court on a motion for summary judgment is not to weigh evidence or determine the truth of the matter, but rather, to decide if there is a genuine issue for trial. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).

The movant bears the initial burden of pointing to deficiencies in the non-movant's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant need not supply evidence negating the opponent's claims; identifying a lack of evidence from the non-movant is enough. *Id.* at 323. If the movant meets this burden, the non-movant must produce specific facts upon which a reasonable juror could find a genuine dispute of material fact. *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 47 U.S. 574, 586–87 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.  ANALYSIS

Plaintiffs brought this case under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80. [R. 1, p. 1, ¶ 1]. The FTCA provides a limited waiver of sovereign immunity, allowing private individuals to bring suit against the federal government for certain torts. 28 U.S.C. §§ 2674, 2680. Specifically, [t]he FTCA waives sovereign immunity where state law would impose liability against a private individual[.]" *Milligan v. United States*, 670 F.3d 686, 692 (6th Cir. 2012); *see also Glarner v. United States*, 30 F.3d 697, 700 (6th Cir. 1994) ("When a veteran is injured at a medical center operated by the United States Department of Veterans Affairs ("VA"), he may file for two different types of recovery: disability benefits . . . and medical malpractice tort remedies under the Federal Tort Claims Act[.]"); *Wilburn v. United*

*States*, No. 18-6005, 2019 U.S. App. LEXIS 13269, at *3 (6th Cir. May 1, 2019) (citing 28 U.S.C. § 1346(b)(1)) ("The FTCA provides a right of action for the negligence of a United States employee if a private party would be liable to the plaintiff under the law of the state where the negligent conduct occurred."). In analyzing claims under the FTCA, courts apply the substantive law of the state where the tort occurred. *Huddleston v. United States*, 485 F. App'x 744, 745 (6th Cir. 2012). Because the events here occurred in Kentucky, the Court will apply Kentucky substantive law. *See id.*; [R. 1, p. 1].

Under Kentucky law, a wrongful death action allows the decedent's representative to seek compensation for injuries suffered by the decedent during his lifetime that were inflicted by the negligent or wrongful act of another. KY. REV. STAT. ANN. § 411.130 (West 2021)*. See generally Gonzalez v. Johnson*, 581 S.W.3d 529, 532 (analyzing whether defendant was negligent to determine plaintiff's entitlement to wrongful death damages). Specifically, KRS § 411.130 provides:

> Whenever the death of a person results from an injury *inflicted by the negligence or wrongful act of another*, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it. . . The action shall be prosecuted by the personal representative of the deceased.

*Id.* (emphasis added). Plaintiff Buchanan brought this wrongful death action against Defendant seeking damages for Turner's injuries related to his fall at the VMCA and alleging Defendant was "negligent," "grossly negligent" and "acted with reckless disregard" in caring for Turner. [R. 1, pp. 2–5]. Plaintiff Steiner, Turner's widow, brought a loss of consortium claim. *Id.* at 5. Under KRS § 411.145, "[e]ither a wife or husband may recover damages against a third person for loss of consortium, resulting from *a negligent or wrongful act* of such third person." KY. REV. STAT. ANN. § 411.145 (West 2021) (emphasis added); *see also Martin v. Ohio Cty. Hosp. Corp.*, 295 S.W.3d 104, 109 (Ky. 2009) (holding that loss of consortium damages under §

- 6 -

411.145 do not cease at the death of the injured spouse.). Therefore, because Kentucky law "would impose liability against a private individual" for wrongful death and loss of consortium, Plaintiffs may bring these claims under the FTCA. *Milligan*, 670 F.3d at 692; *see also Wright v. Fed. Med. Ctr.*, No. 06-CV-258-JMH, 2006 U.S. Dist. LEXIS 73579, at *9 (E.D. Ky. Oct. 2, 2006) ("To the extent that the plaintiffs have asserted a wrongful-death claim against FMC-Lexington, the United States, or the BOP, that claim would be governed by the requirements of the FTCA."); *Simpson v. United States*, No. 2012-258, 2016 U.S. Dist. LEXIS 102690, at *7, 11 (E.D. Ky. Apr. 8, 2016) (awarding damages for loss of consortium under the FTCA).

The Court will first address the new allegations in Plaintiffs' Response, reframing this case as one of understaffing, elder abuse and neglect, and corporate deceit. Then, the Court will analyze the merits of Defendant's Motion for Summary Judgment.

### a. Claims Alleged in Plaintiffs' Response

In their Response to the Motion for Summary Judgment, Plaintiffs argue that "the VA attempts to label this case as 'medical malpractice.'" [R. 40, pp. 1–2]. They contend, however, that "[t]his is a case of understaffing, corporate neglect, and elder abuse and neglect" and "perhaps corporate deceit." Plaintiffs' Complaint, fairly construed, includes allegations of understaffing. [R. 1, p. 4, ¶ 12(g)]. Specifically, Plaintiffs alleged that the VAMC failed "to provide sufficient staffing of personnel to provide care and treatment." *Id.* Plaintiffs attempted to develop the understaffing claim through witness statements from Momeyer and Jeremy Wright. [R. 40–1, p. 3; R. 40–8, pp. 2–4, 13:25–24:25]. The Court analyzes that claim below. *See infra* Section III(b)(ii).[1]

---

[1] The Court also finds that any issues regarding "elder neglect" go to the ordinary negligence claims in Plaintiffs' Complaint. The Court examines the negligence claims in detail below. *See infra* Section III(b).

Plaintiffs' attempt, however, to reformulate their claims to include "elder abuse" and "corporate deceit" fails. Plaintiffs' Complaint includes claims for wrongful death and loss of consortium based on "negligence" and "gross negligence." [R. 1, pp. 4–5, ¶ 12]. Claims of elder abuse and corporate deceit appear nowhere in the Complaint, [R. 1, pp. 1–6], and they fail for two reasons: (1) Plaintiffs failed to properly amend their Complaint to assert these claims, and (2) Plaintiffs cannot bring these claims under the FTCA.

First, Plaintiffs cannot declare new claims in a response to a motion for summary judgment without amending their Complaint. *See Woody v. Aurora Commer. Corp.*, 779 F. App'x 348, 353 (6th Cir. 2019) ("We have repeatedly held that new claims may not be raised in response to a motion for summary judgment except in accordance with Rule 15(a).") (citing *Tucker v. Union of Needletrades, Indus. and Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005)). Under Federal Rule of Civil Procedure 15(a), an amendment more than twenty-one days after the opposing party files an answer or Rule 12 motion requires either the consent of the opposing party or the Court's leave. Fed. R. Civ. P. 15(a). Defendant filed its answer on December 20, 2019. [R. 12]. Plaintiffs do not have the opposing party's consent, nor have they moved to amend their Complaint. Because Plaintiffs have not followed the procedures under Rule 15(a), they cannot assert these claims. *See Woody*, 779 F. App'x at 353.

Second, the FTCA does not extend to these claims. The FTCA provides a limited waiver of the United States' sovereign immunity so the federal government can be held liable "in the same manner and to the same extent as a private individual [would be liable] under like circumstances." 28 U.S.C. § 2674. Importantly, Kentucky law does not recognize a private right of action for elder abuse claims. *See Porter v. Cathey*, No. 2011-CA-000398-MR, 2012 WL 2471107, at *8 (Ky. Ct. App. June 29, 2012). In *Porter*, the Kentucky Court of Appeals refused

to find a civil cause of action for elder abuse within KRS Chapter 209, which was enacted "to provide for the protection of adults who may be suffering from abuse, neglect, or exploitation[.]" *Id.*; *see also* KY. REV. STAT. ANN. § 209.010 (West 2021). The *Porter* court explained that it would "not turn a statute describing a crime, with which [Defendant] has not been charged, into a civil cause of action." *Id.* This Court will likewise not interpret KRS Chapter 209 to create a civil right of action for elder abuse. *See id.* Therefore, a plaintiff could not hold a private individual liable "under like circumstances," and the FTCA's waiver does not extend to such claims. *Id*. Further, Congress specifically exempted claims of deceit from the FTCA. 28 U.S.C. § 2680(h) (creating an exception to the FTCA for "[a]ny claim arising out of . . . deceit[.]"); *Salt Lick Bancorp v. F.D.I.C.*, 187 F. App'x 428, 440–41 (6th Cir. 2006) (upholding dismissal of misrepresentation and deceit claims against the United States because "28 U.S.C. § 2680(h) specifically exempted such claims from the United States' waiver of its sovereign immunity."). Because the FTCA's limited waiver of sovereign immunity does not extend to claims of elder abuse or corporate deceit, sovereign immunity bars them. In any event, Plaintiffs fail to support their allegations of elder abuse and corporate deceit with any evidence that demonstrates a genuine issue of material facts for trial. The Court now turns to Plaintiffs' negligence claims.

### b. Ordinary Negligence versus Medical Malpractice Claims

"A common law negligence claim requires proof of (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012) (citation omitted). Ordinary negligence cases can be established without expert testimony. *Caniff v. CSX Transp., Inc.*, 438 S.W.3d 368, 375 (Ky. 2014). Conversely, medical malpractice cases usually require expert medical testimony to establish "the applicable

standard of care, any breach that occurred and any resulting injury to the plaintiff." *Blankenship v. Collier*, 302 S.W.3d 665, 667 (Ky. 2010). Specifically, in a medical malpractice action, plaintiffs must show, through expert testimony, "that the treatment given was below the degree of care and skill expected of a reasonably competent practitioner and that the negligence proximately caused injury or death." *Wheeler v. Baptist Healthcare Sys., Inc.*, 14 F. App'x 559, 561 (6th Cir. 2001) (quoting *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982)) (quotation marks omitted). Failure to provide adequate expert testimony is grounds for granting summary judgment for the opposing party. *Johnson v. United States*, No. 3:15-cv-715-DJH-CHL, 2018 WL 3636567, at *5 (W.D. Ky. July 31, 2018); *see also Blankenship*, 302 S.W.3d at 675 ("A jury trial without the requisite proof is a futile exercise, wasteful of judicial time, jurors' time and the litigants' time and resources.").

Kentucky law recognizes two exceptions to the expert testimony requirement for medical malpractice claims: (1) *res ipsa loquitor* situations where "the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it," and (2) where the defendant makes admissions from which the jury can infer negligence. *Blankenship*, 302 S.W.3d at 670 (citation omitted). Plaintiffs do not argue that either exception applies, and the Court can find no grounds for applying either one. *See id.* First, most cases applying the first exception involve mistakes during surgery or other medical procedures, where the risk of injury was extraordinary, its occurrence was within the defendant's exclusive control, and plaintiff did not contribute to his own injury. *See Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006) (explaining that typical examples of the first exception include "cases where the surgeon leaves a foreign object in the body or removes or injures an inappropriate part of the anatomy"); *see also Ashland Hosp. Corp. v. Lewis*, 581 S.W.3d 572, 578 (Ky. 2019) (collecting

cases). The facts of this case do not implicate *res ipsa loquitor*. *See Blankenship*, 302 S.W.3d at 670. Second, Defendant has not made admissions that make its negligence apparent. *See id.* Thus, Plaintiffs must produce expert testimony to support their medical malpractice allegations.

Not every hospital fall case requires expert testimony. "Whether expert testimony is required in a hospital slip and fall case depends on whether hospital personnel were exercising professional judgment as opposed to rendering nonmedical, administrative, ministerial or routine care, or simply carrying out doctor's orders." *Chamis v. Ashland Hosp. Corp.*, 532 S.W.3d 652, 656 (Ky. Ct. App. 2017) (citing *McGraw v. St. Joseph's Hosp.*, 488 S.E.2d 389, 396 (W. Va. 1997)); *see also Martin v. Our Lady of Bellefonte Hosp., Inc.*, No. 2013-CA-000877-MR, 2014 WL 7339265, at *3–5 (Ky. Ct. App. Dec. 24, 2014); *Southwell v. Summit View of Farragut, LLC,* 494 F. App'x 508, 513–14 (6th Cir. 2012); *Dawkins v. Union Hosp. Dist.*, 758 S.E.2d 501, 505 (S.C. 2014) ("The statutory definition of medical malpractice . . . does not impact medical providers' ordinary obligation to reasonably care for patients with respect to nonmedical, administrative, ministerial, or routine care."). Stated another way, "[w]hether expert testimony is required depends upon whether hospital personnel must exercise professional judgment to prevent a fall by determining which specialized measures tailored to a specific patient's condition need to be implemented or whether they are merely implementing standard care or specialized individual care per doctor's orders." *Martin*, 2014 WL 7339265, at *4. Accordingly, "[e]xpert testimony is not needed to establish the standard of nonmedical, administrative, ministerial or routine care." *Id.* That is because "professional judgment is not needed to determine whether hospital staff members were negligent in administering routine care equivalent to what patients would receive from non-professionals in their own homes." *Id.*; *see also Thompson v. Ashland Hosp. Corp.*, No. 2010-CA-000801-MR, 2011 WL 2693553, at *2 (Ky. Ct. App. July 8, 2011)

(finding expert testimony unnecessary because case was "more akin to a routine 'slip and fall' negligence action than a medical malpractice action involving complex and sophisticated medical procedures which are outside the knowledge or skill ordinarily possessed by the average person."); *Banfi v. Am. Hosp. for Rehabilitation*, 529 S.E.2d 600, 606 (W.Va. 2000) (expert testimony is necessary when "the allegation in question involves a technical medical decision, which is not within the ordinary and common knowledge of the average lay juror."); *Massey v. Mercy Med. Ctr. Redding*, 180 Cal. App. 4th 690, 697 (Cal. Ct. App. 2009) (holding that the plaintiff did not need to present expert testimony because "a nurses' traditional role has involved 'both routine, nontechnical tasks as well as specialized nursing tasks'" and "Nurse O'Bar was engaged here in a routine, nontechnical task of assisting a fall-risk patient to walk a short distance to the bathroom.") (citation omitted).

In true medical malpractice cases where expert testimony is required, to satisfy the expert testimony requirement, an expert must provide more than mere conclusory statements. *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010). Rather, the expert must explain 'how' and 'why' she arrived at her results. *Id.*; *see also Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) ("[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation.") (citation omitted). "To establish the applicable standard of care, the expert should 'explain what a reasonable health-care provider would have done during the interactions between' the patient and the [provider]." *Johnson,* 2018 WL 3636567, at *3 (citation omitted). However, the inquiry does not center on any particular verbiage; a court must look at the substance of the report, rather than the form, when determining if the report can establish the requisite elements. *Lacefield v. LG Elec., Inc.*, No. 3:06-12-KKC, 2008 WL 544472, at *4 (E.D. Ky. Feb. 26, 2008). A report in which an

expert fails to explain her underlying rationale is inadequate to raise a genuine issue of material fact. *Austin v. Children's Hosp. Med. Ctr*., 92 F.3d 1185 (6th Cir. 1996) (table). For example, the Sixth Circuit (applying Kentucky law) reasoned that an expert's affidavit did not sufficiently establish the elements of negligence when he "provided only a two-sentence conclusory statement that the defendants breached the standard of care 'by failing to provide timely and proper medical treatment,' and that the breach was the direct and proximate cause of the [injury]." *Moore v. United States Dep't of Agric.*, No. 17-5363, 2018 WL 1612299, at *3 (6th Cir. Jan. 31, 2018). Similarly, in *Gayer v. United States*, the court found that an expert who simply listed numerous deviations from the standard of care, without explaining that standard, failed to demonstrate duty and breach. *See* No. 3:16-CV-00467-GNS-HBB, 2019 WL 2130155, at *7–10 (W.D. Ky. May 14, 2019). The *Gayer* court emphasized that the expert failed to explain how a "reasonably competent medical provider" would have behaved in like situations. *Id.*

Experts must also explain how the provider's negligence proximately caused the injury. Kentucky law follows the "substantial factor" test of causation from the Second Restatement of Torts; "[t]o be the proximate cause of the injury, the conduct in question must be a substantial factor in causing the injury." *Chesnut v. United States*, 15 F.4th 436, 443 (6th Cir. 2021) (quoting *Lewis*, 581 S.W.3d at 577–78); *Lacefield,* 2008 WL 544472, at *3. Expert testimony is required to demonstrate that the medical professional's actions were *probably,* not just possibly, a substantial factor in causing the patient's injury. *Lacefield,* 2008 WL 544472, at *3; *see also Lewis*, 581 S.W.3d at 580. A plaintiff's expert must show causation to a "reasonable degree of medical probability, rather than mere possibility or speculation." *Chesnut*, 15 F.4th at 443.

Here, any medical malpractice claims by Plaintiffs necessarily depend upon Momeyer's report. Plaintiffs argue that the testimonies of the hospital nursing staff and Dr. Falls (the medical

examiner who performed Turner's autopsy) will supplement their expert requirement. But Plaintiffs have failed to demonstrate that any testimony from the hospital nursing staff would provide a standard of care, proof of breach, or causation for Plaintiffs claims, nor that Dr. Falls could provide any testimony aside from his opinion that blunt force trauma from a fall caused Turner's death. [R. 40–12, pp. 1–2; R. 40–13, p. 2, 8:21–24]. Further, Plaintiffs stated that the treating physicians will solely provide factual testimony about Turner's medical records. [R. 40–12, p. 2]. Thus, Momeyer's report must support Plaintiffs' medical malpractice claims.

      With this framework in mind, the Court will analyze each of Plaintiffs' claims to determine whether Plaintiffs have raised a genuine issue of material fact as to the necessary elements of duty, breach, and causation.

### i. Proper Assessment Claim, ¶ 12(a).[2]

      In the Complaint, Plaintiffs allege Defendants failed to "adequately and competently assess" Turner. [R. 1, p. 4, ¶ 12(a)]. Because proper medical assessment involves the exercise of professional judgment, this is a medical malpractice claim. *See Chamis*, 535 S.W.3d at 656 ("Determining whether [patient] was at a high risk of falling required an exercise in professional judgment."). But Momeyer's report directly contradicts any allegation the Defendant failed to adequately assess Turner, finding, "Turner's nursing care plan . . . as written was appropriate" and "[f]all risk assessments were performed with reasonable accuracy on admission and by nurses on the nursing unit 5North." [R. 40–1, p. 2]. Defendant argues that the complete lack of expert evidence on standard of care, breach, and causation dooms this claim. [R. 40]. To survive summary judgment, Plaintiffs had to point to "specific facts" that created a genuine issue of material fact with regard to whether Turner was properly assessed. *Celotex*, 477 U.S. at 324.

---

[2] These references relate to paragraphs in Plaintiffs' Complaint. [R. 1].

Plaintiffs make no argument whatsoever, much less a factual showing, on this claim. *See* [R. 40].

Thus, the Court considers this issue undisputed. *See Everson v. Leis*, 556 F.3d 484, 496 (6th Cir.

2009) ("The failure to present any evidence to counter a well-supported motion for summary

judgment alone is grounds for granting the motion."); *Rugiero v. Nationstar Mortg., LLC*, 580 F.

App'x 376, 378 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(e)(2)) ("[I]f a party . . . fails to

properly address another party's assertion of fact as required by Rule 56(c), the court may . . .

consider the fact undisputed for the purposes of the motion."). Plaintiffs wholly fail to support

this claim, and Defendant is entitled to summary judgment.

### ii.   Understaffing Claim, ¶ 12(g)

Plaintiffs allege that the VAMC understaffed its facility, resulting in insufficient care and

treatment of Turner. [R. 1, p. 4, ¶ 12(g)]. Plaintiffs' Response indicates the understaffing claim

sounds in ordinary corporate negligence, not medical malpractice. [R. 40, pp. 1–2]. In fact,

understaffing may be understood as an ordinary negligence claim. *See Harris v. Extendicare*

*Homes, Inc.*, 829 F. Supp. 2d 1023, 1029 (W.D. Wash. 2011) (finding that "decisions regarding

training, hiring, and staffing are typically business/operational decisions, not health care

decisions[.]"); *Wilson v. Americare Sys*., 397 S.W.3d 552, 561 (Tenn. 2013) ("It is a matter of

reason and common sense within the jury's fact-finding province to infer that, in an employment

setting, if there is too much work required of too few employees, either the work will not get

done or the quality of the work will be diminished.") (citations omitted); *Lowndes Cty. Health*

*Servs., LLC v. Copeland*, 352 Ga. App. 233, 239 (Ga. Ct. App. 2019) (finding that a negligent

staffing claim against a nursing home sounded in ordinary negligence, not professional

malpractice, so expert testimony was not required). *See generally Martin*, 2014 WL 7339265, at

*4 ("Expert testimony is not needed to establish the standard of nonmedical, administrative,

ministerial or routine care*."*). Regardless of how the Court construes the claim, it cannot survive summary judgment.

To support this claim, Plaintiffs provide only the testimony of Momeyer and Nurse Jeremy Wright. This testimony is insufficient to establish the required elements of breach of the duty of care and causation. In his deposition, Wright explained that he recalled staffing concerns on Unit Five North prior to Turner's fall. [R. 40–8, pp. 2–4, 13:25–24:25]. He stated that around the time of Turner's fall, the hospital typically understaffed the unit, deviating from its normal practice of five RNs or LPN's per unit. *Id.* at 2, 14:22–25. However, Wright fails to explain why five nurses in a unit is necessary. *See id.* And importantly, he cannot recall the exact number of nurses and nurses' aides on staff on the night of Turner's fall. *See id*. at 15:4–6. Momeyer provides only generalized discussion of the understaffing claim, citing no specific staffing numbers or ratios at the VAMC, and merely parrots Wright's statement that the unit was often understaffed. [R. 40–1, p. 3] ("According to Jeremy Wright, RN the VA and in particular the 5 North nursing unit had understaffing issues."). Thus, neither witness clarifies the necessary staffing ratios nor whether the unit deviated from the necessary ratios on the night of Turner's fall.

Moreover, neither Momeyer nor Wright allege that understaffing was a substantial factor in causing Turner's fall. *See Charash v. Johnson*, 43 S.W.3d 274, 277 (Ky. Ct. App. 2000) ("While there was proof that [the hospital] was understaffed while [plaintiff] was a patient, there was no attempt to connect the understaffing to the failure to properly treat [plaintiff]."). As to causation, Momeyer generally states that falls are "one of the most common problems of understaffed facilities" and that, in understaffed situations, staff are "unable to give each patient . . . adequate attention, supervision, and appropriate, timely responses." *Id.* She further

explains that understaffing "*may* have been a factor in the nurses' failure to

respond . . . appropriately to Mr. Turner's needs." *Id.* (emphasis added). But Momeyer does not

connect understaffing in Unit Five North as the cause of Turner's fall to any degree of medical

probability. *See Lacefield,* 2008 WL 544472, at *3. Similarly, although Wright hypothesizes that

increased staffing "may have" prevented Turner's fall (without explaining his logic), he states,

"[t]here's no guarantee he wouldn't have fallen." [R. 40–8, p. 5, 97:17– 19]. Importantly, neither

witness stated that understaffing *probably* caused Turner's fall, but rather, merely speculated that

it "may have" played a role. *See Lacefield,* 2008 WL 544472, at *3. Indeed, neither witness

explained how understaffing affected Turner's fall *at all*, considering that he fell in the presence

of two nurses and a nurses' aide. *Id.* at pp. 13–14, 68:12–69:22; [R. 1, pp. 3–4]. Plaintiffs fail to

raise a genuine issue of material fact on the issues of breach and causation, regardless of whether

the claim is for ordinary negligence or medical malpractice. Accordingly, this claim fails.

### iii.   Monitoring Device Failure Claim, ¶ 12(d)

Plaintiffs likewise fail to raise a genuine issue of material fact related to their monitoring

device claim. Plaintiffs allege that Defendants placed Turner "in imminent danger of serious

harm and death by choosing not to provide him with a working monitoring device." [R. 1, p. 4, ¶

12(d)]. Like the understaffing claim discussed above, this allegation may sound in ordinary

negligence. *See Stewart v. Galen of Kentucky*, No. 2001–CA–001801–MR, 2003 WL 1232081,

at *1 (Ky. Ct. App. Jan. 10, 2003) (finding expert testimony unnecessary because a reasonable

juror could infer that failure to plug in a "bed check alarm," as required by physician orders, may

have prevented the patient's fall); *Martin*, 2014 WL 7339265, at *5 ("Professional judgment is

not needed to determine whether staff members were negligent in implementing a physician's

order as to the level of care needed."); *see also Chamis*, 532 S.W.3d at 656 (quoting *McGraw*,

- 17 -

488 S.E.2d at 396) ("Whether expert testimony is required in a hospital fall case depends on whether hospital personnel were exercising professional judgment as opposed to rendering nonmedical, administrative, ministerial or routine care, or simply carrying out doctor's orders."). Regardless of how the Court construes the claim, it cannot survive summary judgment because Plaintiffs fail to raise a genuine issue of material fact as to causation.

Although Momeyer states that the wander guard bracelet "failed to activate the sensor at the nursing station, allowing Mr. Turner to pass the nurse's station unnoticed by staff in that location charting," she then clarifies that a nurse attended to Turner after hearing the wander guard alarm that *did* sound near the end of the unit [R. 40–1, p. 3]. Momeyer provides no further explanation as to how any monitoring device failure caused Turner's fall. *See id.* at 1–4. The record indicates that nurses assisted Turner regardless of the alarm failure at the nursing station, and Nurse McNew, who was in the same hallway as Turner, was generally aware of Turner's movements without the need for a monitoring device. [R. 40–7, pp. 3–4, 48:8–49:21; R. 40–8, pp. 9–10, 51:16–54:10]. Therefore, Plaintiffs have not raised a genuine issue of fact as to an essential element of this claim, and Defendant is entitled to summary judgment.

### iv.   Fall-Related Claims, ¶¶ 12(i) & (j)

Plaintiffs allege that Defendant was "negligent" and "grossly negligent" by failing "to provide appropriate . . . intervention of falls," [R. 1, p. 4, ¶ 12(i)],[3] and failing "to ensure that Mr. Turner had effective supervision to prevent a fall." *Id.* at ¶ 12(j).

Momeyer's report explains the fall plan protocols developed by Defendant given that Turner was assessed as a "high risk for falls." [R. 40-1, p. 2]. Momeyer then opines that, given Turner's "increasing restlessness and agitation" on the day of the fall, Defendant "failed to

---

[3] To the extent this allegation includes a claim for failure to "provide appropriate assessment . . . of falls," it fails for the reasons outlined in Section III(b)(i).

respond appropriately to [Turner's] needs by providing increased supervision and distraction for his safety." Specifically, she suggested "providing 1 to 1 assistance, accompaniment and guidance until his restlessness subsided while further assessing for a potential root cause of the behavior (ie. Need to toilet, unfamiliarity of environment) [.]" *Id.* This claim sounds in medical malpractice because it requires professional medical judgment to determine whether other measures, in addition to those already in place under the care plan, were necessary to provide the standard of care. *See Martin*, 2014 WL 7339265, at *3–5. Momeyer fails, however, to opine that these additional interventions were required to meet the professional standard of care. *See id.* at *4 ("[E]xpert testimony would be needed to determine whether additional precautions were needed because it would not be obvious to a jury whether the steps taken were insufficient in light of his condition."); *see also* [R. 40–1]. Additionally, Momeyer does not directly address causation for this claim. Like the expert in *Moore*, Momeyer only mentions causation in two conclusory, generalized statements: "[d]eviations in the standards of care directly caused Mr. Turner's fall and subsequent injuries that led to his death" and "because of the violations of standards of care by the VA and its staff, Mr. Turner suffered severe outcomes." [R. 40–1, pp. 2, 4]; *see also Moore*, 2018 WL 1612299, at *3. In providing only an overarching opinion on causation, Momeyer does not explain how the failure to implement these additional measures played a substantial role in causing Turner's injury to a reasonable degree of medical probability. *See id.* at 1–4.; *see also R.C. Olmstead*, 606 F.3d at 271. This failure is especially apparent considering that nurses *did* intervene in accordance with some of her suggestions prior to Turner's fall, by providing "1 to 1 assistance, accompaniment and guidance." *See id*. at 1–4; *see also* [R. 40–8, p. 13, 68:4–25]. In sum, Momeyer fails to explain "how" or "why" any failure to adopt additional intervention measures was a substantial factor in Turner's fall. *See R.C.*

*Olmstead*, 606 F.3d at 271; *see also Chesnut*, 15 F.4th at 443; *Lacefield,* 2008 WL 544472, at \*3. This medical malpractice allegation fails.

But Plaintiffs' Complaint is not limited to whether increased medical procedures were necessary to meet the medical standard of care and to prevent Turner's fall. [R. 1]. Rather, the Complaint includes general allegations that medical staff negligently failed to prevent his fall. *Id.* at 4, ¶¶ 12(i), (j). Momeyer similarly opines that VAMC employees failed to steady Turner prior to his fall or direct his body toward a softer fall. [R. 40–1, p. 3]. As discussed above, "[w]hether expert testimony is required in a hospital fall case depends on whether hospital personnel were exercising professional judgment as opposed to rendering nonmedical, administrative, ministerial or routine care, or simply carrying out doctor's orders." *Chamis*, 532 S.W.3d, at 656. The Court finds that, unlike the allegation that additional measures and "increased supervision" were needed to protect Turner, this allegation involves "nonmedical, . . . routine care" and sounds in ordinary negligence. That is, whether medical staff, in redirecting Turner to his room, provided "effective intervention" or negligently failed to prevent his fall, involves the type of care "routinely applied to all patients" and "equivalent to what patients would receive from non-professionals in their own homes." *See id.* at 657; Martin, 2014 WL 7339265, at \*4; *see also Arnold v. James B. Haggin Mem'l Hosp.,* 415 S.W.2d 844, 845 (Ky. Ct. App. 1967) ("[T]he evidence, when properly evaluated, presents an issue of whether the employees of the hospital who were assigned to walk [the patient] and to properly protect her from injury (such as by falling) were negligent in the performance of their duties."); *Dawkins*, 758 S.E.2d at 505 (finding that a claim stemming from a patient's fall while walking unattended in the emergency room sounded in ordinary negligence because it did not involve the exercise of professional judgment); *Banfi*, 529 S.E.2d at 608 (holding that a plaintiff did not need to produce expert testimony as to

- 20 -

whether defendants were negligent by not preventing his fall). Stated another way, whether the

nurses negligently caused Turner's fall or failed to exercise ordinary and reasonable care to

steady him or provide a softer landing does not involve the exercise of professional medical

judgment. Jurors could evaluate this issue without the need for expert testimony. *See Thompson*,

2011 WL 2693553, at *2 ("[W]e cannot conclude that an average person would be unable to

discern without the benefit of expert testimony why Mr. Thompson fell off the table, nor why the

fall allegedly resulted in injury.").

Nothing in the Complaint grounds the allegations in medical malpractice only. [R. 1].

Indeed, the Complaint never uses the term "medical malpractice" or "standard of care." Instead,

Plaintiffs' Complaint can fairly be read as including a claim of ordinary negligence. *Id.* at p. 5, ¶

15 ("*In addition to the claim for negligence*, Ms. Steiner seeks redress for an individual claims

for loss of consortium.") (emphasis added).[4] For instance, the Complaint alleges: "The VA

assessed Mr. Turner as being at high risk of falls," *id.* at ¶ 8; "The VA failed . . . to give [Turner]

effective supervision to prevent him from falling, *id.*; "The VA was responsible for keeping Mr.

Turner safe from falls," *id.* at ¶ 10; "the VA . . . [was] negligent [and] grossly negligent" by

failing "to provide intervention of falls" and failing "to ensure that Mr. Turner had effective

supervision to prevent a fall." *Id.* at ¶ 12. They allege that "as a consequence of the VAs failures,

Mr. Turner suffered injuries . . . and death," *id.* at ¶ 11, and further that "as a direct and

---

[4] In the civil cover sheet to their Complaint, Plaintiffs identified the nature of their suit as "personal injury–medical malpractice." [R. 1–1]. The Court, however, does not find this designation controlling, but rather reviews the language of the Complaint to determine whether, fairly construed, it raises a claim for ordinary negligence. *See Creager v. Duchak*, No. 1:17-CV-350, 2018 U.S. Dist. LEXIS 77124, at *10–11 (S.D. Ohio, May 8, 2018) ("The civil cover sheet is not a pleading," but rather, an administrative form to help the Clerk's office open a case.); *Smith v. United Way*, No. 16-cv-11320, 2016 U.S. Dist. LEXIS 53965, at *3–5 (E.D. Mich. Apr. 22, 2016) (reasoning that, although "Plaintiff had check-marked the box indicating that the basis for jurisdiction is a federal question and indicated that the nature of her suit is 'civil rights,'" her complaint stated a state law wrongful termination claim).

proximate result of the VA's failures to provide proper care to Mr. Turner, he . . . sustain[ed] serious, permanent and painful injuries . . . and die[d]." *id.* at ¶ 14.

The Complaint, properly construed, states a claim of ordinary negligence. The VAMC and its staff owed Turner a duty of reasonable care. *See Wright*, 381 S.W.3d at 213 ("The standard of care applicable to a common-law negligence action is that of ordinary care—that is, 'such care as a reasonably prudent person would exercise under the circumstances.'"); *see also Dawkins*, 758 S.E.2d at 504 ("[A]t all times, the medical professional must 'exercise ordinary and reasonable care to insure that no unnecessary harm [befalls] the patient.'"). The record evidence demonstrates a genuine issue of material fact as to whether the nurses, in re-directing Turner to his room, breached their duty of reasonable care to steady Turner, or to prevent or soften his fall. For example, nurses' aide Neace told police that McNew and Wright "took [Turner] by both arms (one arm each) in an attempt to get him back to his room," that McNew attempted to "take the cane away" from Turner, and that Turner "fell as a result of [McNew's] attempt to take the cane." [R. 40–3, p. 7]. McNew and Wright deny holding Turner or grabbing for his cane. [R. 40–7, pp. 10–11, 74:11–75:22; R. 40–8, p. 13, 68:4–7]. Further, on August 25, 2018, Nurse Wright made a statement to police providing his account of the events and adding, "I know I didn't do anything wrong, but I think someone else did." [R. 40-3, p. 14].

One of Defendant's experts, Dr. Kiffany J. Peggs, opined that "there is no recommendation, nor is it required by any standard of care, to directly intervene when a person is in mid fall" as "[d]oing so risks injury to both parties." [R. 37–5, p. 7]. She further states that "[u]nder the circumstances at the time of this fall, attempting to catch Mr. Turner would have been a breach of the standard of care and doing that has not been shown to decrease injury in patients, but it can cause or worsen injury to both patient and staff." *Id.* While the Court is

surprised that attempting to intervene or catch a falling patient, especially one designated as a high risk for falls, could constitute a breach of the professional standard of care, Peggs' report does not diminish that Plaintiffs have met their burden to point to evidence raising a genuine issue of material fact on whether Defendant's agents breached the duty of ordinary and reasonable care. [R. 40–3, p. 7; R. 40–3, p. 14].

Additionally, there is sufficient evidence from which a jury could reasonably infer that the nurses' actions and inactions immediately prior to and during Turner's fall proximately caused his fall and resulting injuries. *See* [R. 40–3, pp. 7 (Neace stated that "Turner then fell as a result of [McNew's] attempt to take the cane."), 9 (Neace explained that "Turner had demonstrated signs of unbalance just before [McNew] and [Wright] had taken N. Turner's arms, by leaning forward and backwards to such an extent that it worried staff."), 14 (Wright stated that "he thinks [the situation] was handled poorly" and that he knows he "didn't do anything wrong but [he] thinks someone else did."); R. 40–7, pp. 10–11, 75:1–79:13 (explaining that McNew, Wright, and Neace all watched Turner fall without attempting to break his fall); R. 40–8, p. 15, 77:24–78:18 (Wright admits that he did not try to catch Turner after he "hit Dawn . . . bounced off of her . . . then he stumbled towards his right, [and] tripped over his feet" because he "was too far away")]; *see also Bartley v. Childers*, 433 S.W.2d 130, 132 (Ky. Ct. App. 1968) (explaining that a claimant must introduce sufficient evidence to allow a reasonable jury to infer that the defendant's conduct probably caused the injury, and that "[a]n inference is simply nothing more than a probable or natural explanation of facts . . . (which) arises from the commonly accepted experiences of mankind[.]"); *Patton v. Bickford*, 529 S.W.3d 717, 731 (Ky. 2016) (citing *McCoy v. Carter*, 323 S.W.2d 210, 215 (Ky. 1959) ("[T]he issue of proximate cause should be withheld from the jury only if there is no dispute about the essential facts and

but one conclusion may reasonably be drawn from the evidence.")). Further, the medical examiner who performed Turner's autopsy found that Turner died from "[b]lunt force head injuries sustained in a fall from standing." [R. 14–13, p. 2, 8:21–24]. Defendant counters by repeatedly citing Momeyer's report and claiming, "[e]ven Plaintiffs' expert squarely states that after '[t]he nurse redirected him towards his assigned unit accompanying him at his side,' Turner 'spontaneously, without specific provocation raised his cane and st[r]uck the nurse walking at his right side.'" [R. 41, p. 5]. But Defendant repeatedly misrepresents Momeyer's report on this issue and takes this statement out of context. [R. 40–1, p. 3]. Momeyer prefaces this statement with the following caveat: "Note: there are discrepancies in the multiple versions of reports as to what happened next." *Id.* After providing the version of events relied on by Defendant, she then goes on to state, "[r]egardless of the variable and conflicting details described in the multiple reports, the staff failed to provide for Mr. Turner's safety[.]" *Id.* Defendant's attempt to mischaracterize Momeyer's report on this issue is unhelpful and unavailing. To be sure, there is other testimony supporting Defendant's position that Turner struck Nurse McNew with his cane, and in doing so, lost his balance and fell. [R. 40–7, p. 10, 74:2–75:22; R. 40–8, p. 14, 69:7–22]. But Plaintiffs have certainly raised genuine issues of material fact as to what caused Turner's fall and resulting injuries. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

Construing the evidence in the light most favorable to Plaintiffs, they have raised a genuine issue of material fact as to whether medical staff exercised ordinary and reasonable care immediately prior to and during Turner's fall, and whether their actions or inactions proximately caused his injury and death. The Motion for Summary Judgment will be denied on this issue.

- 24 -

### v.  Failure to Train and Monitor Claim, ¶ 12(h)

The Complaint alleges negligence for failure to "properly train and monitor" personnel. Momeyer's report is devoid of any opinions supporting this claim, with one possible exception. Momeyer states that Turner's nurse, McNew, ran after him after realizing he had taken off down the hallway, screaming his name. She opines this was "inappropriate" and likely caused "increased fear and anxiety." [R. 40–1, p. 3]. Whether this claim rests in ordinary negligence or medical malpractice, it fails on causation. Plaintiffs fail to tie any "increased fear and anxiety" caused by Nurse McNew's actions, to Turner's fall and injuries. *See id.* Momeyer fails to address causation for this claim, only mentioning causation in two conclusory, generalized statements: "[d]eviations in the standards of care directly caused Mr. Turner's fall and subsequent injuries that led to his death" and "because of the violations of standards of care by the VA and its staff, Mr. Turner suffered severe outcomes." [R. 40–1, pp. 2, 4]. If viewed as a medical malpractice claim, Momeyer's report is insufficient to establish causation to a reasonable degree of medical certainty. *See Chesnut*, 15 F.4th at 443; *see also Martin*, 2014 WL 7339265, at *4; *Chamis*, 532 S.W.3d at 656. But even under ordinary negligence, there is insufficient evidence of causation on this point. The record demonstrates that Turner had a history of aggressive behavior due to his Parkinson's disease and dementia, which caused his family to admit him to the VAMC, [R. 40–2, pp. 14–15], and was already in an agitated state that evening, [R. 40–2, pp. 21, 23, 25–26; R. 40–7, p. 6, 58:13–14]. There is simply no evidence linking Nurse McNew's actions as a substantial factor in Turner's fall and injuries.

### vi.  Remaining Claims, ¶¶ 12(b), (c), (e), & (f)

In her report, Momeyer failed even to mention any of the remaining allegations in the Complaint, or did so only in a conclusory manner, which concern: (1) failure to provide a safe

and secure environment for Turner, [R. 1, ¶ 12(b)]; (2) failure to adequately and competently document Turner's condition, *id* at ¶ 12(c); (3) failure to treat him with appropriate medication after the fall, *id.* at ¶ 12(e); and (4) failure to take steps to protect Turner, *id.* at ¶ 12(f). These allegations sound in medical malpractice because they implicate the exercise of medical judgment related to the standard of care for a "safe" environment for patients with Turner's medical history, what the medical standard is for documenting Turner's condition, and the appropriate medical treatment after his fall. *See Martin*, 2014 WL 7339265, at \*4. Defendant correctly points to the deficiencies in Momeyer's report concerning these allegations, or otherwise argues the claims are conclusory allegations devoid of support in the record. [R. 37; R 41]. The Court agrees. Momeyer's report says nothing about the standard of care, breach, or causation related to these claims. [R. 40-1]. Further, the allegations related to failure to provide a "safe and secure environment" for Turner, [R. 1, ¶ 12(b)], and failure "to take steps to protect" Turner, *id.* at ¶ 12(f), are likewise not supported by expert testimony, and in any event, are conclusory and wholly undeveloped. Accordingly, even if these claims sounded in ordinary negligence, they fail as a matter of law. *See Gooden v. City of Memphis Police Dept.*, 67 F. App'x 893, 895 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 888 (1990)) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment.").

## IV.  CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** as follows:

1.  Defendant's Motion for Summary Judgment, **[R. 37]**, is **GRANTED IN PART and DENIED IN PART.**

    a.   The Motion is **DENIED** as to the ordinary negligence claim regarding

        Turner's fall.

    b.   The Motion is **GRANTED** as to all other claims.

This the 25th day of March, 2022.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY